UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

AREMMA J. PINEDA-HENLEY,

    Plaintiff,

vs.                                                      Case No.  3:09-cv-974-J-MCR

MICHAEL ASTRUE, Commissioner of the
Social Security Administration,

    Defendant.
_____/

**MEMORANDUM OPINION AND ORDER**[1]

This cause is before the Court on Plaintiff's appeal of an administrative decision denying her application for Social Security benefits.  The Court has reviewed the record, the briefs, and the applicable law.  For the reasons set forth herein, the Commissioner's decision is **AFFIRMED**.

**I.     PROCEDURAL HISTORY**

Plaintiff filed applications for a period of disability, disability insurance benefits ("DIB"), and Supplemental Security Income ("SSI") payments on November 18, 2004, alleging an inability to work since March 26, 2004.  (Tr. 91-95).  The Social Security Administration ("SSA") denied her applications initially and upon reconsideration.  (Tr. 59-68).  Plaintiff then requested a hearing before an Administrative Law Judge (the "ALJ") on October 16, 2006.  (Tr. 69-70).  Plaintiff received a hearing on October 15, 2007, followed by a supplemental hearing on January 11, 2008.  (Tr. 493-21).  On

---

[1] The parties consented to the exercise of jurisdiction by a United States Magistrate Judge.  (Doc. 14).

February 13, 2008, the ALJ issued a decision finding Plaintiff not disabled. (Tr. 17-29). On March 11, 2008, Plaintiff filed a Request for Review by the Appeals Council. (Tr. 13). The Appeals Council received additional evidence into the record, but subsequently denied Plaintiff's request for review. (Tr. 6-11). Accordingly, the ALJ's February 13, 2008 decision was the final decision of the Commissioner. Plaintiff timely filed her Complaint in the United States District Court on September 25, 2009. (Doc. 1).

## II.   NATURE OF DISABILITY CLAIM

### A.   Basis of Claimed Disability

Plaintiff claims to be disabled since March 26, 2004, due to major depression; anxiety; post-traumatic stress disorder ("PTSD"); and severe cuts on her arms, face, and back. (Tr. 126-35).

### B.   Summary of Evidence Before the ALJ

On the dates of both hearings before the ALJ, Plaintiff was thirty-one years of age and had completed at least an eighth grade education. (Tr. 497, 509). Plaintiff had past relevant work as a fitness trainer, a stocker, a retail manager, and a telephone answering clerk. (Tr. 504, 514). Plaintiff's medical history is discussed in the ALJ's decision and will be summarized here.

As noted by Plaintiff's treating physician, Kaberi Samanta, M.D., Plaintiff "ha[d] a long history of psychiatric treatment and behavior problems . . . and [] had multiple psychiatric admissions, starting when she was young and in school." (Tr. 227). However, Plaintiff's alleged disability stemmed from being stabbed multiple times by a former co-worker. (Tr. 349). On March 26, 2004, Plaintiff presented to the Medical

Center of Louisiana at New Orleans for repair of lacerations to the neck, both shoulders, and scalp. (Tr. 203). The wounds were surgically closed and Plaintiff was discharged on March 29, 2004. (Tr. 201).

On July 26, 2004, Plaintiff went to the Lakeview Center Inc. ("Lakeview") for assistance regarding anger and depression in response to being stabbed. (Tr. 232). Plaintiff reported a history of mental health treatment, substance abuse, and emotional abuse from her adoptive parents. (Tr. 232-33). Plaintiff's history also included two previous suicide attempts. (Tr. 233). Plaintiff was diagnosed with PTSD and was encouraged to seek outpatient counseling. Id.

On August 9, 2004, Plaintiff met with Mark E. Josephson, M.D. to establish new patient care. (Tr. 197-200). Dr. Josephson's physical examination was unremarkable, but his Zung depression test revealed severe to extreme depression. (Tr. 198-99). Dr. Josephson's treatment plan included prescriptions for Paxil and Trazodone. (Tr. 199). On August 12, 2004, Plaintiff reported to Dr. Josephson that her sleep had improved and she was tolerating the medication. (Tr. 195). Dr. Josephson remarked Plaintiff's affect seemed much brighter than on August 9, 2004. Id.

On October 27, 2004, Dr. Samanta began treating Plaintiff at Lakeview. (Tr. 229). Plaintiff complained her medication was ineffective. Id. At this time, Dr. Samanta corroborated Dr. Josephson's diagnosis of depression, but ruled out major depression. (Tr. 230). Dr. Samanta also added a prescription for Risperdal. Id. Plaintiff met with Dr. Samanta again on November 24, 2004. (Tr. 228). Plaintiff reported she had been taking her medication as prescribed and she thought her mood swings were more manageable and controlled by the medication. Id. Dr. Samanta noted Plaintiff's affect

was improving and continued Plaintiff's prescription for Trazodone, Paxil, Vistaril, and Risperdal.  Id.

On December 15, 2004, Dr. Samanta completed a Psychiatric/Physcological Impairment Questionnaire.  (Tr. 296-303).  Dr. Samanta opined Plaintiff's symptoms were reasonably consistent with her impairments, which he listed as PTSD and depression, ruling out major depression.  (Tr. 296, 298).  Additionally, he concluded Plaintiff was capable of functioning in a low-stress work environment.  (Tr. 302).  Dr. Samanta based this conclusion on Plaintiff's improved response to treatment, which he observed at the November 24, 2004 visit.  (Tr. 302).

Plaintiff's improvement was short-lived.  On January 27, 2005, Plaintiff saw Dr. Samanta for a follow-up appointment.  (Tr. 227).  Plaintiff admitted she had stopped attending counseling and had run out of her medication.  Id.  She also told Dr. Samanta she had attempted suicide and had been admitted to West Florida Hospital as a result.  Id.  The physicians at West Florida Hospital prescribed Lexapro, which Dr. Samanta refilled, along with a prescription for Seroquel.  Id.

On February 28, 2005, Evelyn Manreal, M.D. conducted a follow-up appointment on behalf of Dr. Samanta.  (Tr. 226).  Plaintiff reported she was not doing well and was depressed about being accused of domestic violence against her husband.  Id.  Dr. Manreal increased the dosage of Plaintiff's prescriptions for Seroquel and Lexapro, however, Dr. Manreal did not give Plaintiff any refills.  Id.  There is no evidence Plaintiff refilled her prescriptions after her appointment with Dr. Manreal.

On May 5, 2005, Plaintiff was admitted to the Friary of Lakeview ("the Friary") in response to an episode of binge drinking that precipitated Plaintiff's sixth suicide

attempt. (Tr. 223). Plaintiff underwent inpatient alcohol dependence treatment, which lasted until May 30, 2005. (Tr. 223-25). At the time of admission, Plaintiff had not attended counseling since November 24, 2004.[2] (Tr. 306). Terry Ptacek, M.D. conducted the intake examination and noted Plaintiff appeared depressed with a flat affect. (Tr. 224). Dr. Ptacek diagnosed Plaintiff's depression as pre-existing because its history stemmed back to when Plaintiff was fourteen years of age. (Tr. 225).

Plaintiff's response to treatment while residing at the Friary appears positive but its extent is unclear. On her final weekly evaluation, Plaintiff reported feeling "love struck, happy and excited," but at her exit interview later the same week, she was described as anxious and depressed. (Tr. 221-22). Also, the discharging physician described Plaintiff's continuing care plan as superficial and opined Plaintiff would need enhanced insight to maintain sobriety and stability. (Tr. 221). While Plaintiff was receiving treatment at the Friary, the Santa Rosa County Sheriff's Office issued a bench warrant for her arrest, charging her with domestic violence against her husband. Id. Plaintiff was aware of this and planned to turn herself in after discharge from the Friary. Id.

Plaintiff was booked at the Santa Rosa County Jail on June 20, 2005. (Tr. 273). Plaintiff underwent a Forensic Assessment on June 24, 2005. (Tr. 285). Her affect was anxious and depressed and she was diagnosed with bipolar disorder, depression, and PTSD. (Tr. 287). She was subsequently examined by a state agency psychiatrist on June 30, 2005 and July 5, 2005. (Tr. 283-84). On both instances Plaintiff was found

---

[2] The Court recognizes there is a typographical error in the transfer summary regarding the date of Plaintiff's counseling session.

neither homicidal nor suicidal, so no further evaluations took place while Plaintiff was incarcerated.  Id.  On July 21, 2005, Plaintiff got into a physical altercation with another inmate, resulting in a probation violation that extended her incarceration until December 8, 2005.  (Tr. 268, 278, 307).

On June 15, 2006, Plaintiff presented to the family practice clinic at the Naval Hospital, Pensacola ("NH Pensacola") requesting continued counseling.  (Tr. 396).  On August 28, 2006, Plaintiff went to the Whiting Field Family Medical Clinic at NH Pensacola for treatment of anxiety, depression, and PTSD.  (Tr. 378).  Plaintiff reported she had stopped taking Trazodone at the advice of her social worker and was not seeing a psychiatrist.  Id.  Plaintiff's prescription for Trazodone was renewed and Plaintiff was scheduled to return within a month.  However, on August 31, 2006, Plaintiff was involved in a motor vehicle accident.  (Tr. 372, 377).  It appears Plaintiff had appointments scheduled at the social work clinic, but there is no evidence in the record of further treatment until November 2006.  (Tr. 364-65).

On November 2, 2006, Plaintiff met with Douglas H. Fraser, M.D. for treatment of bipolar disorder and PTSD.  (Tr. 349-51).  Dr. Fraser reassessed Plaintiff's prescriptions: he discontinued Ambien, continued Trazodone, prescribed Xanax on an as needed basis, and began a trial of Geodon.  (Tr. 350).  Over the course of his treatment, Dr. Fraser also initiated trials of Seroquel and Abilify.  (Tr. 347-48).  Taking Abilify, Plaintiff immediately reported improved mood and irritability.  (Tr. 344-46).  On January 2, 2007, Plaintiff stated "Abilify is great" and that she was "always in [a] happy zone."  (Tr. 345).  Likewise, on January 23, 2007, Plaintiff stated she was "not at all depressed."  (Tr. 343).  However, between January 2, 2007 and January 9, 2007,

Plaintiff failed to take Abilify for two or three days and she recognized herself developing a more irritable mood. (Tr. 344). Plaintiff discontinued treatment with Dr. Fraser after January 23, 2007 because she moved to New Orleans, Louisiana. (Tr. 343, 345).

After moving to New Orleans, Plaintiff resumed her treatment relationship at the Family Doctors.[3] (Tr. 443-46). Plaintiff went to the Family Doctors for various, unrelated reasons on February 22, 2007 and July 26, 2007, and at neither time did she refill her prescription for Abilify. (Tr. 440-46). Following her final appointment with Dr. Fraser on January 23, 2007, the next time Plaintiff received a prescription for Abilify was February 21, 2008, from the Robert Detris Mental Health Clinic. (Tr. 352).

Between these treatment periods, Plaintiff underwent a disability determination by Lester Clayton Culver, M.D. (Tr. 331-37). This examination took place on August 14, 2007 and the sources of information Dr. Culver relied upon were Plaintiff's self reports and Lakeview's records from 2004 and 2005. (Tr. 331). Plaintiff reported her psychological difficulties began after been stabbed by a co-worker in 2004. Id. She indicated she was currently taking Xanax, Trazodone, and Abilify, which her husband managed. (Tr. 333). Dr. Culver took note of Plaintiff's self-described cognitive, social, and functional limitations. (Tr. 333-34). Specifically, Plaintiff stated she experienced memory loss, stayed in her room watching television, and did not want to meet anyone. (Tr. 334). Plaintiff also reported hearing the voice of the woman who stabbed her. (Tr. 332). Conversely, Plaintiff reported no difficulty using the telephone or remembering phone numbers. (Tr. 334). She further indicated leaving home three times per week to

---

[3] Plaintiff originally established a treatment relationship with the Family Doctors on April 19, 2006, complaining of symptoms unrelated to her disability application. (Tr. 447-50).

7

visit her sister and mother.  (Tr. 334).

During the structured interview, Dr. Culver indicated Plaintiff's affect was "blunted-depressed, ashamed and anxious."  (Tr. 336).  Tests for attention, orientation, and memory were normal.  Id.  Specifically, Plaintiff could repeat six digits forward and backward; she knew the president, the vice president, and the governor; and did not become distracted by extraneous noises.  Id.  Dr. Culver also noted Plaintiff was able to make change and was able to do simple addition and subtraction.  (Tr. 334, 337).  Summarizing Plaintiff's personality test, Dr. Culver stated Plaintiff's answers were consistent but "she endorsed far too many rare items."  (Tr. 334).  According to Dr. Culver, "[e]ndorsement of rare items can be caused by a number of factors.  These response styles would include a general tendency to admit to psychopathology, a 'cry for help' or confusion."  Id.

Regarding Plaintiff's ability to perform work-related activities, Dr. Culver reported no limitations on Plaintiff's ability to remember or carry out short, simple instructions, but he reported a moderate restriction with detailed instructions and work-related decisions.  (Tr. 338).  Further, Dr. Culver opined Plaintiff would have marked restrictions interacting with the public, with co-workers, and with supervisors.  (Tr. 339).  Finally, Dr. Culver opined Plaintiff would have a marked restriction in responding to pressures or changes in routines within a work setting.  Id.  Although Dr. Culver diagnosed Plaintiff with major depressive disorder and PTSD, he attributed all of Plaintiff's restrictions to her severe social anxiety.  (Tr. 339).

8

### C. Summary of the ALJ's Decision

A plaintiff is entitled to disability benefits when she is unable to engage in substantial gainful activity by reason of any medically-determinable physical or mental impairment which can be expected to either result in death or last for a continuous period of not less than twelve months. 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A); 20 C.F.R. §§ 404.1505(a), 416.905(a). The ALJ must follow five steps when evaluating a claim of disability. 20 C.F.R. §§ 404.1520(a), 416.920(a). First, if a claimant is working at a substantial gainful activity, she is not disabled. 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). Second, if a claimant does not have any impairment or a combination of impairments which significantly limit her physical or mental ability to do basic work activities, then she does not have a severe impairment and is not disabled. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, she is disabled. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). Fourth, if a claimant's impairments do not prevent her from doing past relevant work, she is not disabled. 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). Fifth, if a claimant's impairments (considering her residual functional capacity ("RFC"), age, education, and past work) prevent her from doing other work that exists in the national economy, then she is disabled. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). Plaintiff bears the burden of persuasion through step four, while at step five, the burden shifts to the Commissioner. Bowen v. Yuckert, 482 U.S. 137, 146 n.5, 107 S.Ct. 2287 (1987).

In the instant case, the ALJ determined Plaintiff met the nondisability requirements of the Social Security Act and was insured for benefits through March 31,

2010. (Tr. 18). At step one, the ALJ found Plaintiff was unable to sustain substantial gainful activity since her alleged onset date, March 24, 2004. (Tr. 19-21). At step two, the ALJ determined Plaintiff had the following severe impairments: "substance abuse disorder; mental impairment variously diagnosed as depression; bipolar disorder and/PTSD." (Tr. 21). At step three, the ALJ concluded Plaintiff did not meet or equal the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. Id.

The ALJ then determined Plaintiff retained an RFC to perform a limited range of light work. (Tr. 25). Making this determination, the ALJ found Plaintiff's impairments could reasonably "produce the alleged symptoms, but that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms [were] not entirely credible." (Tr. 27).

At step four, the ALJ determined Plaintiff was capable of performing her past relevant work as a stocker (if it did not require waiting on customers) or telephone answering clerk. (Tr. 28). The ALJ continued to step five and found Plaintiff capable of performing a number of other light, unskilled jobs that existed in the national economy, such as a housekeeper or an order filler. Id. The ALJ relied on the vocational expert's testimony at steps four and five, and found the testimony consistent with the information contained in the Dictionary of Occupational Titles. Id. Thus, the ALJ found Plaintiff not disabled under §§ 216(i) and 223(d) of the Social Security Act. (Tr. 29).

### III. ANALYSIS

#### A. The Standard of Review

The scope of this Court's review is limited to determining whether the ALJ applied the correct legal standards, McRoberts v. Bowen, 841 F.2d 1077, 1080 (11th Cir. 1988), and

whether the findings are supported by substantial evidence. Richardson v. Perales, 402 U.S. 389, 390, 91 S.Ct. 1420 (1971). The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla—i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence a reasonable person would accept as adequate to support the conclusion. Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing Walden v. Schweiker, 672 F.2d 835, 838 (11th Cir. 1982) and Richardson, 402 U.S. at 401).

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact and even if the reviewer finds that the evidence preponderates against the Commissioner's decision. Edwards v. Sullivan, 937 F.2d 580, 584 n.3 (11th Cir. 1991); Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991). The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. Foote, 67 F.3d at 1560; accord Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992) (finding the court must scrutinize the entire record to determine reasonableness of factual findings).

B. **Issue on Appeal**

Plaintiff raises one issue on appeal. (Doc. 11). Plaintiff contends the ALJ erred in rejecting the medical opinion of Dr. Culver, the state's consultative physician. (Doc. 11, pp. 10-15). Specifically, Plaintiff suggests the ALJ should have discounted the opinion of Dr. Samanta, Plaintiff's treating physician, and instead deferred to the opinions of Dr. Culver. Id. The Commissioner responds that the ALJ properly

11

determined Plaintiff's RFC by giving more weight to the opinions of her treating physician.

Social security regulations require an ALJ evaluating medical opinion evidence to consider a variety of factors, including the examining and treatment relationships, the specialization of the person giving the opinion, and how well the record supports the opinion in question. See 20 C.F.R. § 404.1527(d)(1)-(6). Generally, the opinions of examining physicians are given more weight than those of non-examining physicians, treating physicians are given more weight than those of physicians who examine but do not treat, and the opinions of specialists are given more weight on issues within the area of expertise than those of non-specialists. See § 404.1527(d)(1), (2) & (5). Comparing Dr. Samanta's opinion and Dr. Culver's opinion, the ALJ stated:

> Dr. Samanta's assessment of claimant's functional status is accorded greater weight than the findings of Dr. Culver, who examined claimant on only one occasion and relied on her subjective allegations in rendering his opinions. Moreover, Dr. Samanta's assessment takes into specific consideration the effects of treatment that he prescribed and monitored.

(Tr. 24). Plaintiff argues the ALJ erred in giving more weight to Dr. Samanta's opinions for several reasons. First, Plaintiff believes Dr. Culver's opinion was more complete than Dr. Samanta's opinion and therefore, should have been given controlling weight. (Doc. 11, pp. 10-11). Plaintiff notes that Dr. Samanta completed the mental RFC forms in December 2004, shortly after Plaintiff's onset date, while Dr. Culver's opinion was rendered in August 2007, after Plaintiff experienced several traumatic events, such as suicide attempts and incarceration for attacking her husband. Accordingly, Plaintiff believes Dr. Culver's opinion is "a more accurate reflection of [Plaintiff's] condition as a

whole since her disability onset in March of 2004 than those of Dr. Samanta." (Doc. 11, p.13).

This is not a sufficient reason for the ALJ to discredit Dr. Samanta's opinion and instead rely upon Dr. Culver's. See McNamee v. Social Sec. Admin., 164 F.App'x. 919, 923-24 (11th Cir. 2006). In McNamee, the plaintiff argued the ALJ erred in relying on a medical opinion from a treating physician because it did not reflect limitations from a subsequent second stroke the claimant had suffered. Id. at 923. The plaintiff, like Plaintiff here, argued the ALJ instead should have given more weight to the opinion of a consulting doctor who examined the plaintiff after the second stroke. In rejecting the plaintiff's argument, the Eleventh Circuit found the ALJ's ability to rely on additional, updated evidence "was adequate to allow the ALJ to make a determination based on substantial evidence." Id. at 924. Similarly, in the instant case, in addition to Dr. Samanta's records, the ALJ had access to updated evidence from Dr. Fraser, who treated Plaintiff from November 2006 through January 2007. (Tr. 342-51). Dr. Fraser rendered his opinions with knowledge of Plaintiff's treatment under Dr. Samanta and the subsequent relapse that resulted in multiple suicide attempts and Plaintiff's incarceration for domestic violence. (Tr. 349-50). Dr. Fraser's notes reflect Plaintiff improved quickly and dramatically while taking Abilify. (Tr. 343-47). During her course of treatment, Plaintiff stated Abilify was great and always put her in a happy zone. (Tr. 345). Also during this time, Plaintiff stated she was "not at all depressed." (Tr. 343). In addition, Dr. Fraser observed Plaintiff's condition deteriorate when she discontinued her medication for as little as two or three days. (Tr. 344). This was similar to Dr. Samanta's observation in January 2005 when Plaintiff stopped taking her medication at

that time and attempted suicide. (Tr. 227). In sum, there was ample evidence in addition to Dr. Samanta's opinion, which was consistent with Dr. Samanta's opinion, to allow the ALJ to make a determination based on substantial evidence.

Moreover, it is interesting to note that in his psychological report, Dr. Culver stated the exclusive sources of information for his opinions were the Lakeview records from 2004 through 2005 and Plaintiff's statements. (Tr. 331). Thus, while Dr. Culver's examination did take place closer in time to the ALJ's decision than Dr. Samanta's assessment, Dr. Culver's opinions did not take into consideration enough information to observe the historical patterns prevalent in Plaintiff's treatment history. Therefore, it is not the case, as Plaintiff contends, that the consultive examiner had more information than the treating physician.

Additionally, Plaintiff argues the ALJ's stated reasons for rejecting Dr. Culver's opinions are either "factually inaccurate or legally unavailing." (Doc. 11, p.13). In rejecting Dr. Culver's opinions, the ALJ stated, "Dr. Culver did not consider the historical pattern of significant and functionally relevant improvement documented in the treatment records and the impact of poor compliance on the severity of symptoms alleged at the time of his examination." (Tr. 23). Plaintiff admits her treatment was "somewhat sporadic," but claims it was improper for the ALJ to "chastise a mentally ill person for the exercise of poor-judgment in obtaining adequate mental health treatment." (Doc. 11, p.13). To support her contention that it was error for the ALJ to reject Dr. Culver's opinion based on his failure to consider Plaintiff's lack of treatment, Plaintiff cites two cases: Blankenship v. Bowen, 874 F.2d 1116, 1124 (6th Cir. 1989) and Regennitter v. Commissioner of the Social Sec. Admin., 166 F.3d 1294, 1296-97

(9th Cir. 1999). Neither of these cases is on point. In both cases, the ALJ discredited the claimant's credibility based on his failure to obtain treatment. In the present case, the ALJ did not discredit Plaintiff's credibility because of her failure to seek treatment. Instead, he simply noted Dr. Culver's failure to consider the pattern of improvement Plaintiff had with treatment and the fact that she had not obtained treatment for a while at the time of his examination. The Court finds no error in this consideration and in any event, it is not the only reason given by the ALJ for rejecting Dr. Culver's opinion.

Indeed, the ALJ also noted that he was rejecting Dr. Culver's opinion due to his reliance on Plaintiff's "subjective allegations in substitution for full consideration of all relevant evidentiary factors." (Tr. 23). As observed by this Court:

> It is well-settled that an ALJ may disregard a medical opinion premised on the claimant's self-reported symptoms if the ALJ has reason to doubt the claimant's credibility. See e.g., Diaz v. Chater, 55 F.3d 300, 307 (7th Cir.1995) (ALJ could reject portion of physician's report based upon plaintiff's own statements of functional restrictions where ALJ found plaintiff's subjective statements not credible); Mastro v. Apfel, 270 F.3d 171, 177-78 (4th Cir.2001) (affirming ALJ's disregard of treating physician's opinion because it "was based largely upon the claimant's self-reported symptoms" and was not supported by the objective medical evidence); Morgan v. Commissioner of Social Sec. Admin., 169 F.3d 595, 602 (9th Cir.1999) (physician's opinion of disability premised to large extent on claimant's own accounts of symptoms and limitations may be disregarded where those complaints have been properly discounted).

Adzima v. Commissioner of Social Sec., No. 6:09-cv-1734-Orl-DAB, 2010 WL 5174495, at *7 (M.D. Fla. Dec. 15, 2010) (quoting Vreeland v. Astrue, 2007 WL 5414923, 9 (W.D. Wis. 2007) (upholding ALJ's decision to reject opinions of claimant's doctors regarding the severity of her mental impairments where rejection was based in part on the ground

that they were founded on claimant's subjective reports, which the ALJ determined were not credible)).

In the present case, Dr. Culver clearly relied extensively on Plaintiff's subjective complaints. Indeed, he expressly stated Plaintiff was the sole informant. (Tr. 331). In his decision, the ALJ concluded Plaintiff's "statements concerning the intensity, persistence, and limiting effects of [her] symptoms [were] not entirely credible." (Tr. 27). Specifically, the ALJ noted that Plaintiff had worked in several different positions after her alleged onset date. Id. While the ALJ indicated that this work was not considered substantial gainful activity for purposes of the evaluation, he found it "demonstrative of an ability to obtain employment" and certainly indicated an ability to function at a much greater level than alleged by Plaintiff. Id. The ALJ also found that Plaintiff failed to provide reasons for quitting these positions or the reasons given were vague (such as Plaintiff's allegation that she quit working for her parents because she "freaked out"). Id. Moreover, the ALJ observed that Plaintiff denied working at Blakely AutoPlex, despite the fact that the records indicated she earned $3,373 from that entity. Additionally, the Court notes the ALJ pointed out several items in Dr. Culver's report that caused him to question the reliability of Plaintiff's subjective statements during her examination with Dr. Culver. Specifically, the ALJ noted Plaintiff's responses on the MMPI test conducted by Dr. Culver were considered invalid because Plaintiff endorsed too many rare items. (Tr. 334). Dr. Culver opined that such a response could indicate "a general tendency to admit to psychopathology, a 'cry for help,' or confusion." (Tr. 334). Of course, such results could also indicate an individual was not being entirely truthful in answering the questions. Additionally, the ALJ pointed out that Plaintiff told Dr. Culver she did not

leave the home, however, earlier in the interview, she told him she left home with her husband about three times per week and visited with her sister or mother. (Tr. 23). In sum, the Court believes the ALJ provided sufficient reasons, supported by substantial evidence, to support his conclusion that Plaintiff was not entirely credible. Therefore, the ALJ's decision to reject the opinion of Dr. Culver for being primarily based on Plaintiff's subjective allegations is consistent with the applicable legal standards and supported by substantial evidence.

**IV. CONCLUSION**

For the foregoing reasons, the Clerk of the Court is directed to enter judgment pursuant to sentence four of 42 U.S.C. § 405(g) **AFFIRMING** the Commissioner's decision. Thereafter, the Clerk is directed to close the file.

**DONE AND ORDERED** at Jacksonville, Florida, this 3rd day of March, 2011.

*Monte C. Richardson*

MONTE C. RICHARDSON
UNITED STATES MAGISTRATE JUDGE

Copies to:
Counsel of Record

17